# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

**In re Teflon Products Liability Litigation,**    :    **CASE NO.:  4:06-cv-00116-REL-CFB**
**MDL NO. 1733**                        :
                                          :

### Previous Case No.:  05-21921 CIV- HIGHSMITH/McALILEY
### (USDC SC FL)

NATALIE BELMONTE,
an individual, SHARON
BERENFELD, M.D., an
individual, MONICA
MARTUCCI, an individual,                              **AMENDED COMPLAINT-CLASS ACTION**
NICOLE M. SURI, an
individual, MIRNA HORMECHEA,
an individual, JANET BRILL, Ph.D,
an individual, SYLVIA MOSS,
an individual, MELISSA ZACHARIAS,
an individual, IGNACIO MARTINEZ,
an individual, RICK ROMASH, an
individual, BRIDITTE ROMASH,
an individual, CARMEN FINOL, an
individual,

        Plaintiffs,

v.

E.I. du PONT de NEMOURS and
COMPANY,

        Defendant.
_____/

## AMENDED CLASS ACTION COMPLAINT FOR
## INJUNCTIVE AND MONETARY  RELIEF
### (Jury Trial Demanded)

Class Representative Plaintiffs, NATALIE BELMONT, SHARON BERENFELD, M.D.,

MONICA MARTUCCI, NICOLE M. SURI, MIRNA HORMECHEA, JANET BRILL, PH.D,

SYLVIA MOSS, MELISSA ZACHARIAS, IGNACIO MARTINEZ, RICK ROMASH,

BRIDITTE ROMASH, and CARMEN FINOL, on their own behalf and on behalf of all other Class Members, by and through their undersigned counsel, hereby file this Amended Class Action Complaint for Injunctive and Monetary Relief against Defendant, E.I. du PONT de NEMOURS and COMPANY ("du Pont"), and allege:

## I. INTRODUCTION

1.      This is a class action seeking monetary and other relief on behalf of Plaintiffs and a class of persons who acquired cookware coated with du Pont's "Teflon®" product.  The case arises from du Pont's deceptive and unfair trade practices in making false, misleading, deceptive and unconscionable representations and failing to disclose to the consuming public full and accurate information about the purported safety of Teflon®.  du Pont knew or should have known, but failed to disclose to the consuming public, that cooking products manufactured with or containing Teflon® can release harmful and dangerous substances, including a chemical that has been determined to be "likely" to cause cancer in humans, during the ordinary personal, family, household and commercial uses for which those products were acquired or retained.

2.      du Pont designed, manufactured and distributed Teflon® using these deceptive representations and omissions when it knew or should have known that Teflon® contains substances that may be dangerous and harmful to consumers that can be released when cooking products containing Teflon® are used for their intended and foreseeable purposes.

3.      These actions are brought to redress du Pont's unconscionable acts and practices, as further alleged below, and for (i) declaratory, injunctive and equitable relief on behalf of the Plaintiff Class Representatives and the other Members of the Classes who are consumers and/or owners of cooking products containing du Pont's Teflon® product; (ii) to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon®; (iii) to require that du Pont

2

cease and desist from the manufacturing, sale and distribution of cooking products containing Teflon®, which products cause the potential adverse and harmful effects complained of herein and/or compel du Pont to stop making misstatements, misrepresentations, and/or omissions concerning the potential adverse and harmful effects of the use of cookware that is manufactured with or that contains Teflon®; (iv) to replace and/or exchange all existing Teflon® coated cookware products possessed by Class Members with non-hazardous cookware, or to compensate the class members with the cash equivalent thereof; (v) for equitable relief including rescission and restitution; and (vi) to require that du Pont provide a warning label or other appropriate disclosure on cooking products made with or containing Teflon® regarding the potential adverse and harmful effects of cookware containing or manufactured with Teflon®. These actions also seek damages on behalf of the Plaintiff Class Representatives and other Members of the Class.

## II.  JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §1332 (a)(1) and (d)(2) in that this action seeks relief with a monetary value in excess of $5,000,000.00, exclusive of interest, costs and attorney's fees, and is between citizens of different States.

5.     Venue is appropriate in this judicial circuit pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of Florida.

## III.  REPRESENTATIVE CLASS PLAINTIFFS

6.     Plaintiff, Natalie Belmonte, is a resident of Broward County, Florida and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

3

7.      Plaintiff, Sharon Berenfeld, M.D., is a resident of Broward County, Florida and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

8.      Plaintiff, Monica Martucci, is a resident of Broward County, Florida and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

9.      Plaintiff, Nicole M. Suri, is a resident of Miami-Dade County, Florida, and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

10.      Plaintiff, Mirna Hormechea, is a resident of Miami-Dade County, Florida and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

11.      Plaintiff, Janet Brill, Ph.D., is a resident of Broward County, Florida and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

12.      Plaintiff, Sylvia Moss, is a resident of Miami-Dade County, Florida and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

13.      Plaintiff, Melissa Zacharias, is a resident of Broward County, Florida and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

14.     Plaintiff, Ignacio Martinez, is a resident of Broward County, Florida and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

15.     Plaintiff, Rick Romash, is a resident of Broward County, Florida and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

16.     Plaintiff, Brigitte Romash, is a resident of Broward County, Florida and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

17.     Plaintiff, Carmen Finol, is a resident of Broward County, Florida and at all times material hereto, was a consumer of cooking products containing or made with du Pont's Teflon® product.

## IV.  **DEFENDANT**

18.     du Pont is a Delaware corporation.  du Pont markets, sells or distributes Teflon® throughout the State of Florida.

19.     du Pont is in the business of manufacturing and supplying Teflon® for distribution, marketing, wholesaling and retailing in various products made for consumer use. Included among these products are housewares, household appliances, and cooking products such as pots and pans.

20.     Defendant du Pont is subject to the jurisdiction of this Court pursuant to Fla. Stat. § 48.193 by:

> (1)(a)  Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state;

> (b)     committing a tortious act within this state; and

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

* * * *

(f)     causing injury to persons or property within this state arising out of an act or omission by du Pont outside this state while (i) du Pont was engaged in solicitation or service activities within this state, and because (ii) the household cooking appliances containing Teflon® that are the subject of this action were used or consumed within this state in the ordinary course of commerce, trade or use; and

* * * *

(2)     du Pont is engaged in substantial and not isolated activity in this state;

all as more fully alleged herein.

## V.  <u>BACKGROUND AND GENERAL ALLEGATIONS</u>

21.     du Pont was founded in 1802.

22.     du Pont operates in more than seventy (70) countries.

23.     Teflon® was invented in 1938 at du Pont's Jackson Laboratory.

24.     Teflon® is du Pont's trademarked name for the chemical polytetrafluoroethylene (PTFE).

25.     du Pont has registered the Teflon® trademark in 19 countries and first began selling Teflon® commercially in 1946.  The Teflon® product became a popular component of cookware in the 1960's.

26.     As du Pont proudly boasts in its Teflon® website:

Teflon® is really everywhere.  Not only can you find it in your clothes and on your cookware, but you can also find it on products on almost every continent.

27.     According to du Pont's Teflon® website: "There have been billions of cookware products coated with Teflon® non-stick coating sold around the world over the past 40 years."

28.     du Pont claims on its Teflon® website that "the Teflon® brand is one of the world's most recognized and respected" brands and has strong consumer recognition.

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

29.     Teflon® is commonly found in "non-stick" cooking products, such as in pots and pans, stir fryers and woks, pizza pans, breadmakers, cookie sheets, griddle pans and skillets, wafflers, deep fryers, crock pots, roasting pans, cake pans and molds, and other common cooking utensils and aids.

30.     Teflon® and the chemicals used in its production represent a $2 billion per year industry.

31.     du Pont nets an estimated $200 million per year from its sale of Teflon®.

32.     du Pont has advertised and represented to the public that Teflon® makes life easy, and reportedly has called Teflon® a "housewife's best friend."

33.     du Pont claims on its Teflon® website that "the Teflon® brand is one of the world's most recognized and respected of all ingredient brands" and that Teflon® enhances consumer recognition.

34.     du Pont's scientists have studied whether products containing Teflon® are safe for use by consumers.  du Pont has continually represented to consumers in public statements and documents, in press releases, and on its websites that Teflon® is safe for consumer use and has denied that the use of cooking products containing Teflon® can be harmful to human health.

35.     du Pont's Teflon® website, www.Teflon®.com, is replete with statements touting the safety of Teflon® coated cookware, such as "cookware made with Teflon® non-stick coating is totally safe for everyday use."

36.     du Pont has backed such claims with boasts, such as the following, of its decades of quality assurance and testing work concerning cookware that is coated with its Teflon® product:

> du Pont certification seal means you can trust cookware to meet the toughest du Pont standards for quality and performance.

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

> Standards are upheld by a unique 13-point checklist for quality assurance.  Plus, du Pont tests cookware in a rigorous battery of real-world tests, including over 30 years of in-home kitchen testing and an ongoing program of professional chef testing conducted in commercial restaurants.

37.     In addition, du Pont has represented to consumers that it retains oversight and control of the use of its Teflon® product by licensees who wish to combine it with their cookware products. For example,

> Before a manufacturer is licensed to use a du Pont non-stick coating, they must submit their products to du Pont to make certain that exacting quality standards are met.  Once a manufacturer is licensed, du Pont conducts periodic testing to ensure that those standards are consistently upheld.  Finally, each manufacturer conducts in-house tests against their own quality standards.

38.     du Pont has continually represented to consumers in public statements, advertisements and other writings, in press releases, and on its websites, that there is no danger or risk posed by using cooking products coated with Teflon®, and has denied that the normal and customary use of cooking products coated with Teflon® presents any human health risks.

39.     Perflourooctanoic acid ("PFOA") is a perflourinated detergent/surfactant that is manufactured, processed, and/or distributed by du Pont in connection with its manufacture of Teflon®.  PFOA is also sometimes referred to by du Pont as C-8.

40.     PFOA is the chemical used to give Teflon® its "non-stickiness."

41.     PFOA is a synthetic chemical that does not occur naturally in the environment.

42.     PFOA is a liver toxin in animals, is biopersistent in humans and animals and bioaccumulative in humans.

43.     PFOA is associated with other health concerns in animals, including cancer and developmental defects.

44.     PFOA is not naturally occurring but is nonetheless found to contaminate the blood of humans in all geographic regions of the United States.

45.     For example, a study released in 2001 by 3M Corporation found that PFOA was present in the blood of ninety six percent (96%) of the 598 children tested.  The children were located in 23 states.

46.     Studies have indicated that PFOA causes developmental toxicity and other adverse effects in animals.

47.     du Pont has conducted both animal and human studies and tests on PFOA.

48.     In 1981, 3M, a manufacturer of PFOA, advised du Pont that PFOA may cause birth defects in laboratory animals.

49.     Also in 1981, du Pont possessed a document describing the results of a blood sampling study du Pont conducted on eight (8) employees who were either pregnant or who had recently given birth.  This study was done at the plant where Teflon® was manufactured.  This document identified the levels of PFOA in the blood of du Pont's pregnant employees and described the status of the fetus.

50.     A purpose of du Pont's blood sample study was to monitor these pregnant employees for PFOA exposure, and to monitor umbilical cord blood for the presence of PFOA and to test the babies' blood for the presence of PFOA.

51.     The 1981 document demonstrates the presence of PFOA in the umbilical cord blood of at least one of the eight (8) du Pont employees and in the blood of another worker's baby.  Thus, du Pont knew or should have known from this study that PFOA moved from the mother, through the placenta, to the fetus.

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

52.     In 1982, du Pont reported data to the EPA regarding the transplacental movement of PFOA in rats.  The EPA considered this information to be "substantial risk data."  du Pont failed to disclose to the EPA (or to consumers), however, that it had obtained human blood sampling data in 1981 that confirmed the transplacental movement of PFOA in humans, and further failed to disclose to the EPA the information it had about the occurrence of birth defects in the babies of its female workers exposed to PFOA.

53.     Upon disclosure of this additional information, the EPA found that du Pont's human blood sampling data demonstrating the transplacental movement of PFOA "reasonably supports the conclusion that PFOA presents a substantial risk of injury to human health."

54.     More specifically, the EPA contends that du Pont's human blood sample data demonstrating that PFOA crosses the human placental barrier between PFOA exposed mothers and their fetuses suggests that the fetuses could experience toxic effects from PFOA, including bioaccumulation and, as observed in animal tests, developmental toxicity and liver toxicity.

55.     The EPA considers du Pont's human blood sampling study confirming transplacental migration of PFOA "to reasonably support the conclusion of a substantial risk of injury to health or to the environment."

56.     Moreover, the EPA considers du Pont's blood sample data confirming the transplacental movement of PFOA to be "known toxicological information" about PFOA of which du Pont was aware.

57.     Additionally, documents maintained by du Pont chronicling the health effects of babies born to du Pont workers exposed to PFOA indicate birth defects in two (2) of seven (7) babies.

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

58.     Among other things, as a result of du Pont's failure to disclose its 1981 blood sample data to the EPA, the EPA launched an investigation into du Pont's concealment of its study information and determined that du Pont engaged in unlawful behavior by concealing the blood sample study results.

59.     du Pont's concealment of its 1981 blood sample study information protected the continued marketability of Teflon® and the profits received by du Pont from its sale of Teflon®. As the EPA pointedly stated in its complaint against du Pont contending that du Pont violated the Federal Toxic Substances Control Act from June 1981 to March 2001 by not reporting health risks from exposure to PFOA:

> [the EPA's efforts to investigate the risks posed by PFOA] might have been more expeditious had the data on transplacental movement of the chemical in humans been submitted immediately by du Pont when du Pont obtained the information in 1981.

60.     du Pont has settled the claims brought by the EPA claiming it violated the Federal Toxic Substances Control Act by paying the largest civil administrative fine the EPA has ever obtained under any federal environmental statute.

61.     After du Pont's settlement with the EPA, du Pont ran full-page advertisements in many major national newspapers in early February 2006 promoting non-stick cookware as "safe" and saying "there is no reason to stop using it."

62.     As of April 24, 2006, du Pont's Frequently Asked Question section of its website continues to deny any concerns over the safety of the Teflon® product:

> Q:      Can I get exposed to PFOA from cookware?
>
> A:      Using the testing methods developed and approved by the U.S. Food & Drug Administration (FDA), du Pont has concluded that consumers cannot be exposed to PFOA through cookware coated with Teflon® non-stick finishes.
>
> Q:      How safe is my cookware?

11

A:     Confidence in the safety and performance of du Pont non-stick coatings on cookware and housewares is based on more than 25 years of laboratory and use testing worldwide. Prior to market introduction, du Pont non-stick coatings were subjected to exhaustive studies at the Haskell Laboratory for Toxicology and Industrial Medicine. The US Food and Drug Administration (FDA) has found them acceptable for conventional kitchen use. In addition, other health regulatory agencies throughout the world have approved the use of du Pont non-stick coatings on cookware and housewares. To date, cooks in more than 40 countries around the world have purchased over 2 billion pots and pans with du Pont non-stick coatings for home and commercial use. In all of this experience, there has been no record of serious or chronic, or acute health problems.

63.     As of April 25, 2006, du Pont continued to deny the risks posed by the Teflon®

product to the consumers on its website:

**Studies using FDA standard testing methods found no detectable level of PFOA in Teflon® non-stick cookware.**
**A published, peer-reviewed study (April 2005) in Environmental Science & Technology** [.pdf] found no PFOA in Teflon® cookware. No PFOA was detected even when the cookware was scratched with a knife. Studies using FDA standard testing methods also found no detectable levels of PFOA in non-stick coatings used for cookware sold under the Teflon® brand. The Danish Technical Institute and China Academy of Inspection and Quarantine tested Teflon® cookware and did not detect PFOA.

However, according to a recently published study conducted by researchers at the U.S. Food & Drug Administration (FDA), PFOA was detected in minute quantities in cookware using extreme and abusive test methods--methods that do not reflect what happens when consumers use cookware. The quantities of PFOA detected through these extreme measures were too small to measure migration of the PFOA out of the cookware. Published, peer-reviewed research clearly shows that cookware is safe for consumer use.

**Consumers can use their cookware with complete confidence.**

**Not all non-stick coatings are branded Teflon®.**

Teflon® branded non-stick coatings are made solely by du Pont. Teflon® is a registered trademark. Not all non-stick coatings are

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

branded Teflon®. Moreover, a stringent certification program ensures that non-stick coatings by du Pont are used only in suitable applications.

**All Teflon® branded products are safe for their intended consumer and commercial use.**

64.　In May, 2005, however, a federal grand jury from the Justice Department's Environmental Crimes Section issued a subpoena to du Pont regarding du Pont's use of PFOA.

65.　There are numerous additional facts and studies of which du Pont was aware demonstrating that exposure to PFOA causes adverse health effects.　PFOA has been linked to cancer, organ damage, and other negative health effects in tests on laboratory animals.　For example, male and female rats and mice have developed several different kinds of tumors when exposed to PFOA.

66.　Various studies have confirmed that exposure to PFOA causes or may cause vascular disease.　For example, it is reported that workers exposed to PFOA at 3M's plant in Cottage Grove, Minnesota, demonstrated a statistically significant, elevated risk of dying from cerebrovascular disease. Findings of vascular disease have also been reported in a study of du Pont workers exposed to PFOA.　Additionally, du Pont's study of the blood of its workers demonstrates a statistically significant correlation between cholesterol and PFOA.　Similarly, there was also a statistically significant correlation between cholesterol and PFOA found in a study of Italian workers exposed to PFOA.　Moreover, there are animal studies showing changes in blood chemistry associated with PFOA exposure that bolster these human study results.

67.　Studies have also shown that exposure to PFOA correlates to incidences of prostate cancer.　For example, workers at 3M's Cottage Grove plant exhibited a statistically significant association between the length of workplace PFOA exposure and prostate cancer

13

mortality.  Moreover, an elevated risk of dying from prostate cancer was found among certain workers exposed to PFOA.  Additionally, workers at 3M's Decatur, Alabama, plant exhibited an increase in demand for medical care for male reproductive cancers (including prostate) compared to the general population, with the greatest increases among those workers in the long-time, high-PFOA-exposure category.

68.    A recent study by Johns Hopkins University researchers found PFOA in the cord blood of 99% of newborn infants.

69.    The Environmental Protection Agency's ("EPA") website states: "[S]tudies have shown that PFOA exposure can result in a variety of toxic effects in animals including liver toxicity, developmental toxicity, and immunotoxicity."

70.    The EPA further states that "PFOA is persistent in the environment.  It will continue to accumulate as long as it is produced."

71.    There are numerous other studies demonstrating many potential health risks related to exposure to PFOA.  Some of these studies include:

(a)    Two analyses of leukemia incidence were conducted from 1956-1989 showing statistically increased odds ratios for workers in du Pont's Washington Works plan from 1956-1989.  Additionally, a general mortality study found an increase in leukemia.

(b)    Workers exposed to perfluorochemicals at 3M's Decatur, Alabama plant exhibited significantly increased numbers of episodes of care for intestinal tumors versus those not exposed occupationally.  An elevated increase of risk of dying from cancer of the large intestine was also seen in those exposed to PFOA in 3M's Cottage Grove, Minnesota plant compared to the general population.

(c)    At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from pancreatic cancer or pancreatic disease was seen among workers exposed to PFOA versus those not exposed occupationally.

(d)    At 3M's Cottage Grove, Minnesota, plant an elevated risk of dying from cancer of the testis or other male reproductive cancers was seen among workers exposed to PFOA versus those not exposed occupationally.

14

(e)     A 3M-sponsored animal study found a statistically significant increase in fibroademonas (mammary tumors) correlated with PFOA dose.

(f)     There are also studies that demonstrate PFOA may be related to adverse pituitary effects and immunological function.

72.     There is evidence that PFOA causes birth defects in animals, especially eye defects.

73.     Rats and mice exposed to PFOA frequently develop tumors of the reproductive organs, liver and pancreas.

74.     A study by du Pont in early 2005 that examined 1,000 employees from its Washington Works facility in West Virginia found a 10% increase in total cholesterol in workers with high concentrations PFOA in their blood.  The cholesterol increase came primarily from an increase in LDL cholesterol, while HDL level remained unchanged.

75.     Similar results had been observed in a longitudinal study of Italian workers exposed to PFOA.  *See* Report by Giovanni Costa describing a meeting with 3M and du Pont, August 23, 2004.

76.     Other evidence of the health effects of PFOA includes a study by 3M that showed that workers present during the manufacture of Teflon® products faced a chance of dying of stroke that was fifteen times the risk faced by unexposed workers.  This suggests that PFOA exposure contributes to vascular disease.  *See* "Mortality study of workers employed at the 3M Cottage Grove Facility. Final Report."  Division of Environmental and Occupational Health, School of Public Health, University of Minnesota Alexander, B. 2001. AR 226-1136. Washington, DC, U.S. Environmental Protection Agency.

77.     Over 40 years ago, du Pont conducted human experiments with Teflon®-laced cigarettes to determine why certain workers were becoming sick on the job with a Teflon®-related illness commonly called Polymer Fume Fever.  du Pont laced the cigarettes of its

15

volunteers with Teflon® and had the volunteers inhale the cigarette fumes until they became sick. In these dosing experiments up to 90% of the people in the highest dose group became ill for an average of 9 hours, demonstrating flu-like symptoms, including chills, back ache, fever and coughing. These symptoms are commonly linked to Polymer Fume Fever. du Pont acknowledges that Teflon® fumes can sicken people, causing Polymer Fume Fever.

78.     Moreover, apparently aware of the adverse effects to humans from inhaling heated particulates and/or fumes emitted by Teflon®, du Pont required its employees to wear respirators when working with Teflon® heated to 400°F (or more) while in poorly ventilated areas. Experiments demonstrate that when cooking in the home, the surface of a Teflon® coated pan can reach this temperature within 2 minutes using a conventional stove top burner set on high.

79.     Reports indicate that a Teflon® coated pan reached 721°F in just five minutes under the same test. du Pont studies show that Teflon® emits toxic particulates at 446°F. At 680°F Teflon® coated pans release at least six toxic gases, including two carcinogens, two global pollutants, and MFA, a chemical lethal to humans at low doses. At temperatures that du Pont scientists claim are reached on stovetop drip pans (1000°F), non-stick coatings break down to a chemical warfare agent known as PFIB, and a chemical analog of the WWI lung-destroying gas warfare agent *phosgene*.

80.     For the past fifty years du Pont has claimed that their Teflon® coatings do not emit hazardous chemicals through normal use. In a recent press release, du Pont wrote that "significant decomposition of the coating will occur only when temperatures exceed about 660 degrees F (340 degrees C). These temperatures alone are well above the normal cooking range." Reported tests show, however, that Teflon® coated cookware exceeds these temperatures through

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

the common act of preheating a pan on a burner set on high.  The toxic particles and gases emitted when Teflon® heats and the temperatures at which these particles and gases are first emitted, follow:

464ºF – Ultrafine particulate matter:  Teflon® produces very small (ultrafine) particles which cause extreme lung damage to rats within 10 minutes of exposure. Longer exposure causes death.

680ºF – Tetrafluoroethylene (TFE): The National Toxicology Program considers *tetrafluoroethylene* (TFE) to be a "reasonably anticipated" human carcinogen because it is known to cause cancer in laboratory animals.

680ºF – Hexafluoropropene (HFP): Exposure to fluorocarbons like HFP can lead to eye, nose and throat irritation; heart palpitations, irregular heart rate, headaches, light-headedness, fluid accumulation in the lung and possibly death. Long-term exposure is associated with decreased motor speed, memory and learning.  In mice and rats, inhalation of hexafluoropropene (HFP) causes kidney lesions, decreased numbers of a type of immune cell and increased urination. HFP also causes increased numbers of chromosomal abnormalities in hamster ovaries.

680ºF – Difluoroacetic acid (DFA):  Kidney toxicity from DFA has been reported in rats.

680ºF – Monofluoroacetic acid (MFA, fluoroacetic acid or compound 1080): Monofluoroacetic acid is toxic.  Doses as low as 0.7 to 2.1 mg/kg can kill people. Initially, people report nausea, vomiting, numbness, tingling, anxiety, muscle twitching, low blood pressure and blurred vision.  If exposure is high enough, people can have irregular heart rate, heart attacks and severe convulsions leading to respiratory failure.

680ºF – Perfluorooctanoic acid (PFOA):  The effects of PFOA are discussed throughout this Complaint.

878ºF – Silicon tetrafluoride (SiF4):  Silicon tetrafluoride is a highly toxic, corrosive gas.  In the lungs, moisture causes the silicon particles to separate, releasing toxic hydrofluoric acid and also coating the lung with silicon particles. Inhaling hydrofluoric acid can cause eye and throat irritation, cough, difficult breathing, bluish skin color caused by lack of oxygen, lung damage and fluid accumulation in the lung.  Long term exposure can cause weight loss, decreased numbers of red and white blood cells (anemia and leucopenia*)*, discoloration of the teeth and abnormal thickening of the bone.

887ºF – Perfluoroisobutene (PFIB):  Perfluoroisobutene (PFIB) is toxic. Inhalation can lead to fluid build up in the lung, a condition that can lead to death.

17

PFIB is listed in the Chemical Weapons Convention as a *Schedule 2 compound*. PFIB is many times more toxic than phosgene, a highly toxic corrosive gas also listed as a chemical weapon.

932ºF – Carbonyl fluoride (COF2):  Breakdown of Teflon® in the air is the major source of carbonyl fluoride exposure.  Carbonyl fluoride is the fluorine version of phosgene, a chlorinated chemical warfare agent.  Carbonyl fluoride fumes can irritate eyes, ears and nose.  More serious symptoms of exposure include chest pains, breathing difficulty, fluid accumulation in the lungs, weakness, liver damage and increased glucose levels.

932ºF – Hydrogen fluoride (HF):  Hydrogen fluoride (HF) is a toxic corrosive gas, and can cause death to tissue it comes into contact with, including tissue in the lungs.  Breathing HF can cause severe lung damage, such as fluid buildup in the lungs and inflammation of lung passages.

1112ºF – Trifluoroacetic acid fluoride (CF3COF):  Trifluoroacetic acid fluoride is toxic when it breaks down into hydrogen fluoride and trifluoroacetic acid.

1112ºF – Octafluorocyclobutane (OFCB):  Inhaling high levels of octafluorocyclobutane can cause heart beat irregularities, unconsciousness and death.  People with pre-existing heart conditions may be extra vulnerable.

81.    The EPA has recently identified significant human health concerns from exposure to PFOA.

82.    On June 27, 2005, a panel of the EPA's Science Advisory Board ("SAB") released a draft of its conclusions after reviewing the EPA's report entitled "Draft Risk Assessment of the Potential Human Health Effects Associated with Exposure to Perfluorooctanoic Acid (PFOA)."

83.    A majority of members of the EPA's SAB concluded that PFOA was likely to cause cancer in humans.  The SAB stated:

> that the experimental weight of the evidence with respect to the carcinogenicity of PFOA was stronger than [previously determined by the EPA], and suggested that **PFOA is a 'likely' carcinogen in humans**.  According to the EPA's Guidelines for Carcinogen Risk Assessment (also known as EPA's Cancer Guidelines), this descriptor is typically applied to agents that have tested positive in more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans.(emphasis added)

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

84.     On January 20, 2006, the Chair of the EPA Science Advisory Board and the Chair of the PFOA Risk Assessment Review Panel, EPA Science Advisory Board wrote to the Administrator of the EPA stating, in part, that:

> [t]he predominant SAB view was that the experimental weight of the evidence regarding the human carcinogenic potential of PFOA was more consistent with the [EPA's] description of 'likely to be carcinogenic' as described in the EPA Guidelines for Carcinogen Risk Assessment since laboratory studies in rats show that PFOA is a multi-site and multi-gender carcinogen.[1]

85.     A recent study from the Centers for Disease Control shows that PFOA may have contaminated the bloodstream of fetuses throughout the United States.

86.     du Pont at all times relevant did not disclose to consumers any of the preceding studies, tests, or data discussed herein.

87.     du Pont at all times relevant did not issue warnings to cookware consumers setting forth the risks and dangers of Teflon®, PFOA, or the other chemicals found in Teflon®, as discussed herein.

88.     du Pont at all times relevant did not instruct or require that its Teflon® licensees, who manufacture the cookware onto which du Pont's Teflon® product is applied, issue warnings to cookware consumers setting forth the risks and dangers of Teflon®, PFOA, or the other chemicals found in Teflon®, as discussed herein.

89.     Instead, du Pont has continually represented to consumers in public statements and documents, in press releases and on its websites that there is no danger posed by PFOA when using cookware coated with its Teflon® product and has denied that the use of Teflon® coated cookware can be harmful to human health.

---

[1]     The EPA's Guidelines for Carcinogen Risk Assessment applies the "likely to be carcinogenic" description to compounds that have tested positive in more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans.

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

90.     du Pont executives continue to claim that the use of Teflon® in cooking products is completely safe.

91.     Further, in May, 2005, a federal grand jury from the Justice Department's Economic Crimes Section issued a subpoena to du Pont regarding du Pont's use of PFOA.

92.     While du Pont and industry scientists have studied the possible health risks associated with the manufacture and use of the Teflon® product since the substance's introduction, the company publicly maintains that "Teflon® is Safe" and that the use of Teflon® non-stick cookware poses absolutely no risk to human health.

## VI.  CLASS ACTION ALLEGATIONS

93.     The Class Representatives seek declaratory, injunctive, and equitable relief on behalf of the Class and to adjudicate du Pont's liability for its deceptive, unfair, and unconscionable representations and omissions.  The Class Representatives also seek rescission, restitution, and/or disgorgement remedies; the creation of a fund to further investigate the potential for adverse health effects resulting from consumer use of Teflon® coated cookware, to require du Pont to cease and desist from making materially false or misleading statements regarding the potential adverse health effects associated with heated Teflon®, to require du Pont to provide a warning label on all Teflon® coated cookware, for other forms of equitable and injunctive relief, and for damages.

94.     Consequently class action is appropriate pursuant to Fed. R. Civ. P. 23 (a), 23(b)(1)(A) and (B) and 23(b)(2).

95.     However, after that notice process, to the extent more than 100 class members affirmatively elect instead (or in addition, to the extent allowable) to seek actual damages not incidental to injunctive and equitable relief to redress du Pont's Deceptive and Unfair Trade Practices, Plaintiffs ask the Court to retain jurisdiction to determine at that time whether

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

additional certification pursuant to Rule 23(b)(3) would be necessary or appropriate as to the group of those so electing.

96.     The Members of the First Class represented ("Class I" or "Class I Members") is composed of all consumers who purchased or obtained ownership, within the State of Florida, of one or more cooking product(s) made with or containing Teflon® on or after July 15, 1993, who are residents of the State of Florida, and who first discovered the potential dangers and/or harm associated with Teflon® on or after July 15, 2001.

97.     The Second Class represented ("Class II" or "Class II Members"), a sub-class of Class I, is composed of consumers who purchased, within the State of Florida, of one or more cooking product(s) made with or containing Teflon®, who are residents of the State of Florida, and who first discovered the potential dangers and/or harm associated with Teflon® on or after July 15, 2001

98.     The size of the Classes is currently unknown but they are estimated to be in excess of 1,000,000 consumers.

99.     du Pont has knowledge of all licensees authorized to manufacture or sell cookware containing Teflon® and the brand and model names so marketed.  Upon information and belief, and subject to information obtainable only through pretrial discovery, du Pont licensed the use of Teflon® to, among others, the following manufacturers and models of cookware:

| MFG. | MODELS |
|---|---|
| **All Clad** | **Emerilware** <br> **LTD** <br> **Cop-R-Chef** <br> **Copper-Core** <br> **MC2** |
| **Anolon** | **Anolon Titanium** |

21

|  | **Advanced**<br>**Classic**<br>**Professional**<br>**Suregrip Bakeware** |
| --- | --- |
| **Basic Essentials** |  |
| **Bodum** |  |
| **Chef's Planet** | **Arc-42 Cookware**<br>**Tefmat Oven & Bake Liners** |
| **Circulon** | **Circulon Total**<br>**Elite**<br>**Premier**<br>**du Pont Autograph**<br>**Circulon Electrics** |
| **Crestware** | **du Pont "Supra Select"**<br>**Platinum Pro**<br>**Silverstone Xtra**<br>**Silverstone Professional** |
| **Cuisinart** | **Chef's Classic** |
| **du Pont** | **Autograph**<br>**Plantinum Pro**<br>**Platinum Select**<br>**Xtra**<br>**Classic** |
| **Farberware** | **Farberware, Inc.**<br>**Farberware Millennium**<br>**Farberware        Nonstick Aluminum**<br>**Restaurant Pro**<br>**Enhanced Nonstick Cookware Select**<br>**Vibrance**<br>**Cooks Kitchen**<br>**Classic Series Nonstick Skillets**<br>**Farberware        Nonstick Bakeware** |

22

| | |
|---|---|
| **GAU** | |
| **GSI Outdoors** | **Bugaboo** |
| **Kitchenaid** | **Gourmet Excellence**<br>**Gourmet Essentials** |
| **Megaware Inc. of California** | **Castalon**<br>**Castame**<br>**Triomphe**<br>**Concorde**<br>**Magnifica** |
| **Newell Rubbermaid** | **Calphalon** |
| **Royal Cougar** | |
| **Salton** | |
| **Silverstone** | **Culinary Colors Series**<br>**Nonstick Stainless Steel Series** |
| **T-Fal** | **Jamie Oliver Cookware** |
| **US Foodservice** | **Next Day Gourmet** |
| **Wearever** | **Mirro**<br>**Regal**<br>**Wearever** |

100.    The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the Court.

101.    There is a well-defined commonality of interest regarding the questions of law and fact that predominate over any questions possessed by only individual members and which make class certification appropriate affecting the Classes.  Questions of law and fact common to the Classes, among others, are:

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

a.      Whether du Pont made, approved, allowed, or ratified representations in Florida through mass marketing and product-specific advertising that Teflon® or the use of Teflon® coated cooking products was safe, or healthful, or that use of Teflon® coated cooking products was more healthful than use of non-Teflon® coated cooking products.

b.      Whether du Pont's mass marketing and product-specific advertising in Florida that Teflon® or the use of Teflon® coated cooking products was safe, healthful, or that use of Teflon® coated cooking products was more healthful than the use of non-Teflon® coated cooking products, would cause a reasonable person to believe the ordinary use of Teflon® coated cooking products entailed no potential human health risk.

c.      Whether at the time of such mass marketing and product-specific advertising in Florida, du Pont possessed or relied upon a reasonable basis in fact (such as factual, objective, quantifiable, clinical or scientific data or other competent and reliable evidence) substantiating representations that Teflon® or the use of Teflon® coated cooking products was safe, healthful, and entailed no potential human health risks.

d.      Whether at the time of such mass marketing and product-specific advertising in Florida, du Pont knew or should have known that the release of substances during the ordinary and foreseeable use of Teflon® coated cooking products could not medically or scientifically be said, to a reasonable degree of professional certainty, to entail no potential human health risks.

e.      Whether at the time of such mass marketing and product-specific advertising in Florida, du Pont had in its possession animal or human test data indicating potential adverse health effects from exposure to one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon® coated cooking products.

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

f.      Whether at the time of such mass marketing and product-specific advertising in Florida, du Pont had knowledge or possession of blood sample test results of its workers indicating transplacental movement of one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon® coated cooking products.

g.      Whether at the time of such mass marketing and product-specific advertising in Florida, du Pont had in its possession data regarding deformities suffered by the children of female du Pont employees exposed to one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon® coated cooking products.

h.      Whether at the time of such mass marketing and product-specific advertising in Florida, du Pont had in its possession information demonstrating or tending to demonstrate that one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon® coated cooking products does present potential risk of injury to human health.

i.      Whether during the time of such mass marketing and product-specific advertising in Florida, du Pont had been notified by the EPA that evidence of transplacental movement of one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon® coated cooking products in laboratory rats was "substantial risk data" of a potential human health risk.

j.      Whether at the time of such mass marketing and product-specific advertising in Florida, du Pont knew or should have known that fumes from heated Teflon® coated cooking products can sicken people.

k.      Whether the representations in du Pont's mass marketing and product specific advertising in Florida, that Teflon® or the use of Teflon® coated cooking products was

25

safe, healthful, or more healthful than use of non-Teflon® coated cooking products, were qualified or unqualified.

l.      Whether at the time of such mass marketing and product-specific advertising in Florida, du Pont disclosed, in a fashion sufficiently specific so as to leave no reasonable probability of misunderstanding, clearly, conspicuously and in close proximity to its affirmative representations, any and all material exclusions, reservations, limitations, modifications, or conditions relevant to the affirmative representations that Teflon® or the use of Teflon® coated cooking products was safe, healthful, or more healthful than use of non-Teflon® coated cooking products.

m.      Whether du Pont's mass marketing and product-specific advertising in Florida affirmatively represented that Teflon® or the use of Teflon® coated cooking products was safe, healthful, or more healthful than the use of non-Teflon® coated cooking products, when du Pont knew or should have known those representations would justifiably induce class members to choose, retain, and/or continue the use of Teflon® coated cookware, or to refrain from choosing and using other cookware, due to du Pont's failure to disclose - knowingly, with scienter, and/or through a failure to exercise reasonable care - what it actually knew, and actually did not know, about the truth or falsity of those representations, thus, rendering those representations untrue, deceptive, or misleading, to the injury of class members.

n.      Whether the Representatives' claims are sufficiently similar to the claims of prospective class members.

o.      The types of equitable and injunctive relief to which the class members may be entitled for deceptive, misleading and fraudulent misrepresentations.

102.    These common questions of law and fact are governed by the laws of the State of Florida, where Defendant has engaged in its wrongful conduct.

103.    The claims of the Representatives are typical of those of the Classes.    The Representatives are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent them.    The Representatives anticipate no difficulty in the management of this litigation as a Class Action. Accordingly, the Representatives are adequate representatives of the Classes and will fairly and adequately protect the interests of the Classes.

104.    A class action is the best available method for the fair and efficient adjudication of this controversy.    The Members of the Classes are so numerous that the joinder of all Members is impracticable, if not impossible.    Because the harm suffered by individual Members of the Classes, while not inconsequential, may be relatively small, the expense and burden of individual litigation makes it impractical for Members of the Classes to seek redress individually for the wrongful conduct alleged herein.    Should each individual Member of the Classes be required to bring separate actions, the resulting multiplicity of lawsuits would cause undue hardship and expense on the Court and on the litigants.    The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interest of other Members of the Classes who are not parties to the adjudications and/or may substantially impede their ability to protect their interests.

105.    To the extent such conditions exist, all conditions precedent to the maintenance of this action have been performed, have occurred, or have otherwise been satisfied or waived.

106.    Plaintiffs, on their behalf and on behalf of the Classes, have retained the undersigned law firms and agreed to pay reasonable fees and costs for their services.

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

## COUNT I

## UNFAIR AND DECEPTIVE TRADE PRACTICES

107.    Plaintiffs, on their behalf and on behalf of the Class I Members, reallege and reincorporate the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

108.    This claim is brought pursuant to Fla. Stat. § 501.201, *et seq*., commonly referred to as the Florida Deceptive and Unfair Trade Practices Act.

109.    The Class Representative Plaintiffs and the Class Members are Consumers within the definition of Fla. Stat. § 501.203(7).

110.    du Pont has engaged in unconscionable acts or practices, and deceptive and unfair acts or practices in the conduct of its business, which acts are unlawful pursuant to Fla. Stat. § 501.204(1).

111.    du Pont knew or should have known that products containing Teflon® were or are potentially harmful to consumers.

112.    du Pont failed to disclose to and concealed from consumers that products containing Teflon® were or are potentially harmful to consumers.

113.    du Pont failed to disclose to consumers and concealed the information it knew of relating to the adverse effects of chemicals contained in Teflon® demonstrated in animal studies, the blood sample data it compiled regarding transplacental movement of chemicals contained in Teflon® and the information it knew of regarding the occurrence of birth defects in the children of its female workers.

114.    du Pont knew or should have known that exposure to PFOA has caused injuries to humans and animals but concealed its knowledge of the potential dangers associated with the use of Teflon® from the public and from the EPA in order to deceive customers into using and purchasing products containing Teflon®.

115.    du Pont has stated repeatedly that both Teflon® and PFOA are innocuous substances.

116.    du Pont has recently expressed an intention to replace PFOA in the production of Teflon® by late 2006.  This fact implies that du Pont is aware of the dangers that may be associated with the use of cooking products that have been produced with Teflon® and with PFOA.

117.    As a direct and proximate result of the foregoing, the Class Representative Plaintiffs and other Class I Members have been damaged.

**WHEREFORE,** the Class Representative Plaintiffs, on behalf of themselves and the Class I Members, demand Judgment against du Pont (A) for injunctive and declaratory relief (i) requiring du Pont to create a fund for ongoing medical monitoring of Florida consumers and residents who have purchased or otherwise obtained cooking products containing Teflon®; (ii) requiring du Pont to provide a warning label on cooking products containing Teflon® regarding the potential adverse and harmful effects of using Teflon® coated cooking products, (iii) declaring the Class I Members' entitlement to elect rescission, restitution, and/or disgorgement remedies against du Pont, and (B) for monetary related relief (i) in the event more than 100 Class I Members so elect, awarding the Class I Members who so elect, actual damages, (ii) awarding

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

the Class I Members interest, costs, and attorneys' fees; and (iii) awarding such other and further relief as this Court deems just and appropriate.

## COUNT II ,

## UNJUST ENRICHMENT

118.    Plaintiffs, on their behalf and on behalf of the Class II Members, reallege and reincorporate the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

119.    du Pont knew or should have known of the potential risks associated with Teflon® coated cooking products as further alleged above, but failed to disclose such facts to the Plaintiffs and to the Class II Members.

120.    Plaintiffs and the Class II Members purchased cooking products made with or containing Teflon® without fully understanding the risks and hazards associated with the use of Teflon® coated cooking products which rendered the cooking products unfit for their intended purpose.

121.    As a result of their purchases, Plaintiffs and the Class II Members conferred a substantial monetary benefit on du Pont.

122.    Upon information and belief, du Pont concealed the potential risks associated with the use of Teflon® coated cooking products in order to reap the substantial monetary benefit from the Plaintiffs and the Class II Members.

123.    du Pont knew of, appreciated, accepted and retained the monetary benefit conferred upon it resulting from the Plaintiffs' and the Class II Members' purchases of Teflon® coated cooking products.

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

124.    By virtue of the foregoing, du Pont was unjustly enriched at the Plaintiffs' and Class II Members' expense.

125.    Under the circumstances, in good conscience and equity, du Pont should not be permitted to retain the substantial monetary benefit conferred upon it by Plaintiffs and the Class II Members.

**WHEREFORE,** the Class Representative Plaintiffs, on behalf of themselves and on behalf the Class II Members, demand Judgment against du Pont and seek an award of damages, disgorgement of du Pont's profits from the sale of Teflon® for cooking products, restitution and/or rescission, pre-judgment and post-judgment interest, court costs and awarding such other and further relief as this Court deems just and appropriate.

## COUNT III

## RESTITUTION

126.    Plaintiffs, on their behalf and on behalf of the Class II Members, reallege and reincorporate the allegations contained in paragraphs 1 through 83 above as if fully set forth herein.

127.    du Pont knew or should have known of the potential risks associated with Teflon® coated cooking products as further alleged above, but failed to disclose such facts to the Plaintiffs and to the Class II Members.

128.    Plaintiffs and the Class II Members purchased cooking products made with or containing Teflon® without fully understanding the risks and hazards associated with the use of Teflon® coated cooking products which rendered the cooking products unfit for their intended purpose.

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000

129.     As a result of their purchases, Plaintiffs and the Class II Members conferred a substantial monetary benefit on du Pont.

130.     du Pont knew of, appreciated, accepted and retained the monetary benefit conferred upon it resulting from the Plaintiffs' and the Class II Members' purchases of Teflon® coated cooking products.

131.     Upon information and belief, du Pont concealed the potential risks associated with the use of Teflon® coated cooking products in order to reap the substantial monetary benefit from the Plaintiffs and the Class II Members.

132.     By virtue of the foregoing, du Pont was unjustly enriched at the Plaintiffs' and Class II Members' expense.

133.     Under the circumstances, in good conscience and equity, du Pont should not be permitted to retain the substantial monetary benefit conferred upon it by Plaintiffs and the Class II Members.

**WHEREFORE,** the Class Representative Plaintiffs, on behalf of themselves and the Class II Members, demand Judgment against du Pont for restitution and such other and further relief as this Court deems just and appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby request trial by jury of all issues so triable as a matter of law.

Respectfully submitted,

KLUGER, PERETZ, KAPLAN & BERLIN, P.L.
*Counsel for Plaintiffs*
Miami Center, 17th Floor
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone:     (305) 379-9000
Facsimile:      (305) 379-3428

32

OPPENHEIM, PILELSKY, P.A.
*Co-Counsel for Plaintiffs*
2500 Weston Road, Suite 404
Weston, Florida 33331
Telephone: (954) 384-6114
Facsimile: (954) 384-6115


Kimberley K. Baer      PK0014675
Steven P. Wandro       PK0008439
WANDRO, BAER & APPEL, P.C.
*Counsel for Plaintiffs*
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312
Telephone:      515/281-1475
Facsimile:      515/281-1474


By:____s/ Kimberley K. Baer_____
          Kimberley K. Baer, Esq.


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via Electronic Mail and a true and correct copy of the Certificate of Service (only) furnished via U.S. Mail to:  **Adam L. Hoeflich, Esq.**, (adam.hoeflich@bartlit-beck.com) Bartlit Beck Herman Palenchar & Scott LLP, 54 W. Hubbard Street, Chicago, IL 60610l; **Robert Fanter, Esq.**, (fanter@whitfieldlaw.com) Whitfield & Eddy 317 Sixth Avenue, Suite 1200, Des Moines, Iowa 50309 and **John Sherk, Esq.**, (jsherk@shb.com) Shook Hardy & Bacon LLP, 2555 Grand Blvd., Kansas City, MO 64108  this 8th day  of May 2006.


By:_____s/ Kimberley K. Baer_____
          Kimberley K. Baer, Esq.

Kluger, Peretz, Kaplan & Berlin, P.L., 201 So. Biscayne Blvd., Suite 1700, Miami, FL 33131  305.379.9000